```
1                    UNITED STATES DISTRICT COURT
                  FOR THE NORTHERN DISTRICT OF GEORGIA
2                          ATLANTA DIVISION

3

4   UNITED STATES OF AMERICA, )
                              )
5            PLAINTIFF,       )
                              )
6    -VS-                     ) DOCKET NO. 1:20-CR-00216-SCJ-LTW-1
                              )
7   JO ANN MACRINA,           )
                              )
8            DEFENDANT.       )
    _____
9

10                   TRANSCRIPT OF SENTENCING PROCEEDINGS
                   BEFORE THE HONORABLE STEVE C. JONES
11                    UNITED STATES DISTRICT JUDGE
                       FRIDAY, FEBRUARY 24, 2023
12

13

14

15  APPEARANCES:

16  ON BEHALF OF THE GOVERNMENT:
          JOLEE PORTER, ESQ.
17        NATHAN PARKER KITCHENS, ESQ.
          Assistant United States Attorneys
18

19  ON BEHALF OF THE DEFENDANT:
          PAUL STEPHEN KISH, ESQ.
20        DAVID HOLMES BOUCHARD, ESQ.

21

22         VIOLA S. ZBOROWSKI, RDR, FAPR, CMR, CRR, RPR, CRC
         OFFICIAL COURT REPORTER TO THE HONORABLE STEVE C. JONES
23                    UNITED STATES DISTRICT COURT
                          ATLANTA, GEORGIA
24                          404-215-1479
                  VIOLA_ZBOROWSKI@GAND.USCOURTS.GOV
25
```

1                    (HELD IN OPEN COURT AT 10 A.M.)

2          THE COURT:  Ms. Wright, as soon as you're seated, call

3    the case for the day.

4          THE DEPUTY CLERK:  The Court calls the matter of the

5    United States of America v. Jo Ann Macrina, Criminal Case No.

6    1:20-cr-00216.

7          THE COURT:  Okay.  The government counsel's will stand

8    up and introduce yourself and who is with you this morning.

9          MR. KITCHENS:  Good morning, Your Honor.  AUSA Nathan

10   Kitchens on behalf of the government.  I'm here with my colleague,

11   Jolee Porter, the Public Integrity Section in D.C., as well as

12   Special Agents with the FBI, Christy Parker, and Brian Davis.

13         THE COURT:  Good morning to all of you-all.

14         For the defense?

15         MR. KISH:  Judge, I'm Paul Kish.  I represent

16   Ms. Macrina.  Along with Mr. Bouchard, we have our trial team with

17   us here and some other people we will introduce to you later in

18   the proceeding.

19         THE COURT:  We're here today for the sentencing of

20   Ms. Macrina.

21         Ms. Macrina, have you had a chance to review the

22   presentence report with your attorney in this case?

23         THE DEFENDANT:  Yes, I have.

24         THE COURT:  At this time the Court will announce the

25   advisory base offense level as recommended -- it's recommended a

```
1   level 14 for the base offense level for Count 1.  There is a
2   two-level enhancement recommended for the number of bribes.  There
3   is a six-level enhancement recommended for the value of the
4   payment.  There is a four-level enhancement for a public official.
5   That gives us adjusted offense level of a 26.
6           There's a total offense level of 26.  A criminal history
7   category of a 1.  A custody guideline range of 63 to 78 months.  A
8   fine guideline range of $25,000 to $250,000.  And a term of
9   supervised release is one to three years.
10          The Court will adopt the facts in the presentence report
11  with no objections being made as the findings of this Court.
12          Now, it's my understanding there are no guideline
13  objections coming from the government.
14          MR. KITCHENS:  That's correct, Your Honor.
15          THE COURT:  And, Mr. Kish, I understand there are two
16  guideline objections coming from the defense dealing with the
17  number of bribes and the value of the payment in paragraphs 43 and
18  44.
19          MR. KISH:  Yes, sir.
20          THE COURT:  You may proceed, Mr. Kish.
21          MR. KISH:  Thank you, Judge.  I'll take these two
22  objections in tandem, if I could.
23          THE COURT:  Yes, sir.
24          MR. KISH:  Because I think they sort of make sense to
25  discuss them together.
```

```
 1              THE COURT:  I agree.

 2              MR. KISH:  And the question the Court has to resolve is

 3    the value of the bribe and the number of the bribe.

 4              THE COURT:  Yes, sir.

 5              MR. KISH:  With the "S" in parentheses, whether there is

 6    one or more than one.  And as we know, this is not a case where

 7    the jury had to make a decision about what was the bribe.  They

 8    simply had the decision that -- make a decision that there was a

 9    conspiracy to commit a bribe in Count 1.  In Count 2, that there

10    was a substantive offense of a bribery.  That's all we know from

11    the jury's verdict.

12              We also know from years of doing this, all the lawyers

13    in the room, that any fact which can increase the guidelines the

14    government has the burden of proof on by a preponderance of the

15    evidence, obviously.

16              So with that in mind -- and we've laid out for you the

17    way we see the facts, which is that the only unrefuted evidence

18    about a bribe came from Ms. Macrina's mouth and from what

19    Mr. Jafari's assistant Ms. Sabooni said about what happened in the

20    Middle East.

21              Ms. Sabooni made it clear she was told to go to the

22    Middle East to essentially purchase whatever Ms. Macrina might

23    have wanted.  And she did.  She had bought some rings, the

24    matching rings they talked about.  They spent a night together.

25    They spent a night each in their hotel rooms.  And she said she
```

1  got some scarves and some other things, and the government

2  candidly valued that at around $5300.  That's what we know from

3  the record that is unrefuted.

4       There is a dispute about some of the words that came

5  from Ms. Macrina's own mouth, how much was it that she said Mr.

6  Jafari gave to her, Ms. Macrina, before she, Ms. Macrina went on

7  that trip.  What is never disputed and what is absolutely clear in

8  the record is that Ms. Macrina repeatedly said whatever amount of

9  money I got from Jafari, it was not for me, Ms. Macrina.

10 Therefore, it could not have been a bribe.  There is not a piece

11 of evidence in the record that refutes that.  Because, as we've

12 mentioned several times both in our objections and in our

13 sentencing memorandum, the other two people that know the answer

14 to that are Mr. Jafari and the now diseased Mrs. Jafari for whom

15 the items were purchased.  The totality of that is that that is

16 the only evidence about any bribe that is unrefuted.

17      Then we go to the question of whether or not the Court

18 can use the four individual $7,500 payments made by Jafari's

19 company, PRAD, to Ms. Macrina in the four-month period after she

20 had been fired by Kasim Reed as being the Commissioner for the

21 Department of Watershed Management, and, obviously, during the

22 same time she's talking to the FBI about exactly what we're here

23 in trial for.

24      We presented evidence through the government's witnesses

25 and through the introduction of defense exhibits about the work

1    Ms. Macrina performed that justified those payments.

2            We pointed out, and I think it was Ms. Christine Burns

3    when Mr. Bouchard was cross-examining her, conceded that the

4    company would regularly bill out engineers of the level and with

5    the experience that Ms. Macrina had at around $200 per hour.  We

6    put in reams of evidence about all the work she did, the resumes

7    that she reviewed.  Ms. Burns conceded seeing Ms. Macrina in the

8    office, and further conceded that the office had these two parts

9    and she often would never know if Ms. Macrina was working.

10           So there is nothing that refutes the notion that

11   Ms. Macrina earned that $30,000, those four $7,500 checks that the

12   company paid to her.  And she earned it by doing work.

13           Interestingly, both the presentence report and the

14   government at trial kind of made a big deal about how the City of

15   Atlanta told Jafari, hey, we heard that Ms. Macrina is working for

16   you, and Jafari said, oh, no, no, she's not working for me.

17           The point is the city and the government took the

18   position that Ms. Macrina violated the ethics laws by going to

19   work for Jafari in the summer after she had been fired.  Well,

20   they can't have it both ways.  They can't say she did wrong by

21   going to work for him and then claim, well, she didn't work for

22   them and, therefore, didn't earn the $30,000.  It's one or the

23   other.

24           So we think that the view of the evidence that really is

25   supported by the record is that the $30,000 was a bona fide

1 salary.  Remember, the Court even gave a jury instruction on that

2 issue.  And the government contends in its sentencing memorandum

3 the jury refuted that notion, but the facts don't show that.  The

4 jury didn't have to make such a decision.

5          So we've got the payments for the Middle East items from

6 Ms. Sabooni, $5300.  The $30,000 was earned.  That then leaves

7 this odd situation involving the landscaper, as we've been calling

8 him, Mr. Vollero.  Mr. Vollero said he knew Jafari because they

9 played poker together.  Jafari said to him, Vollero, I have a

10 friend who needs some landscaping work.  Jafari paid Vollero a

11 thousand dollars.  Vollero had to concede when we cross-examined

12 him, well, I've got these other checks from Ms. Macrina to me,

13 Mr. Vollero, for landscaping work.  Why do you have those?  He

14 says, I don't really know what it was or who was paying me what

15 for what.

16          The record I don't think at all supports the notion that

17 $1,000 was a bribe.  We don't know what it was.  The evidence is

18 -- I think the fancy word is equipoise.  It's kind of balanced as

19 to what it meant.

20          That then leaves us with the only payments that can be

21 used as the bribe calculation in terms of its number and in terms

22 of its value as what Ms. Sabooni paid for in the Middle East.

23 That value is less than $6500.  And it's only a single incident,

24 as we pointed out in the application note for this part of the

25 guidelines, deciding whether or not something is more than one

1  bribe.  Once part of a single incident, there is only one bribe.

2         I'll admit it's close.  But when we think about how

3  sentencing proceedings have been handled under the sentencing

4  guidelines since that day in November of 1987 when they first came

5  into effect, the burden of proof often resolves these close

6  questions.

7         Because the government has the burden of proof, we think

8  there is insufficient evidence from which the Court can use these

9  two parts of the guidelines, and we ask you, therefore, to grant

10  our objections.

11         THE COURT:  Thank you, Mr. Kish.

12         Ms. Porter.

13         MS. PORTER:  Yes, Your Honor.  Good morning.

14         THE COURT:  Good morning, Ms. Porter.

15         MS. PORTER:  Your Honor, I'll start with, perhaps, the

16  most important bribe, that promise of employment that Jeff Jafari

17  gave to Jo Ann Macrina while she was working with the city of

18  Atlanta while she had power over contracts and task orders that

19  would go to him.

20         The value of a lucrative job, a promise of a lucrative

21  job is difficult to pinpoint exactly because you don't know the

22  complete duration that the person will work.  But the government

23  has been conservative in only looking at those four payments of

24  $7,500 that Jeff Jafari gave to Jo Ann Macrina after she left the

25  City of Atlanta.

1          So those four payments of $7,500 total $30,000 from June

2 to September of 2016.

3          Now, the defense claims that Ms. Macrina earned that

4 money rightfully and it was bona fide.  There is no evidence that

5 Ms. Macrina did any work for Mr. Jafari in June of 2016 when she

6 received that first cashier's check.  Not a check as he paid other

7 employees, but a cashier's check.

8          Then in July there was at most a day's work.  The e-mail

9 suggests that the work didn't even take a day before he paid her

10 the second payment.  If it was a legitimate job, if she was

11 earning these payments, if they weren't part of this bribe, this

12 promise that he had given her while she was with the City of

13 Atlanta, why did Mr. Jafari lie about it?

14          And, Your Honor, I'll hand up Government's Exhibits 150

15 and 13 just as a reminder of some of the evidence that we saw at

16 trial.

17          MR. KISH:  Excuse me, do you have copies?  I don't have

18 copies of those, Judge.

19          MS. PORTER:  I'm sorry.

20          THE COURT:  He can use my copy.

21          MR. KISH:  That's fine.  I wanted to double-check what

22 the Court was being presented here.  Thank you very much.

23          THE COURT:  If you need to look at something, you can

24 use mine.

25          MR. KISH:  That's fine, Judge.  Thank you, Your Honor, I

1   appreciate it.

2         MS. PORTER:  Thank you, Judge.

3         In Government's Exhibit 150, Mr. Jafari wrote to then

4   Commissioner of Department of Watershed, "I have attached my

5   letter that was e-mailed to you and Dan Gordon on October 4, 2016,

6   specifically stating that Jo Ann Macrina has never worked for PRAD

7   or JP2.  We have not had any communications with Jo Ann Macrina

8   since 2016."

9         And why if it was a legitimate job and they were

10  bona fide wages would Jo Ann Macrina herself lie about it in

11  Government's Exhibit 13 at page 17?  Her 2016 financial disclosure

12  statement says that she had not been employed in 2016 outside of

13  her work with the City of Atlanta.

14        So why would she, she and Jeff Jafari lie about it if it

15  was a legitimate job and those were bona fide wages?  The

16  government's position is that that's because the job was a bribe,

17  and the payments were part of that bribe, and they were seeking to

18  hide it.

19        Next, I'll turn to the $10,000 payment.

20        Ms. Macrina, as FBI Special Agents Christy Parker and

21  Brian Davis testified, admitted at a February 2019 meeting with

22  them that Jeff Jafari had given her $10,000.  She later -- well,

23  and the FBI corroborated that.  Jeff Jafari's bank statements

24  showed a withdrawal slip on April 15, 2016, the day before she

25  left for the trip to UAE corroborating that he had paid her right

1    before that trip.

2           Ms. Macrina later met with the FBI, and during a

3    recorded interview she sought to minimize the amount that had been

4    given to her and she couldn't keep her story straight.

5           In Exhibit 18 she said it was several thousand.  She

6    later said it was 2 to 3,000, she later said it was 3 to 4,000,

7    she later said it was not more than 5,000.  And then after that

8    she texted Special Agent Christy Parker, as shown in Government's

9    Exhibit 21 and also described in paragraph 27 of the PSR, she

10   texted her and said that Jeff Jafari offered me $10,000 verbally.

11   She said, "I can't confirm what he actually had.  After

12   discussion, he gave me $5,000 for gifts, said he would give me the

13   remainder after, but when he did it was less than $5,000."  So in

14   that text she said it is something more than 5,000 but less than

15   10,000, an ever evolving story.

16          But if that money that he gave her was aboveboard and

17   just were those on gifts, why didn't she disclose it on her travel

18   disclosure form or her financial disclosure forms with the City of

19   Atlanta?  And there's no evidence that it was for gifts for his

20   wife.

21          It's implausible that a vice president of a contractor

22   with the City of Atlanta would ask the commissioner of the

23   Department of Watershed to buy gifts for his wife when we know he

24   sent his office manager, Ferra Sabooni, to Dubai to take care of

25   Ms. Macrina and buy gifts for his wife.  And Ms. Sabooni's credit

1  card statements corroborate her testimony that she did, in fact,

2  buy gifts for his wife per his instruction.  She bought him or his

3  wife an over $7,000 necklace.  And, Your Honor, that's reflected

4  in Government's Exhibit 1C.

5          There is another charge, the $1497 charge at the same

6  jewelry store in Dubai, and that Ms. Sabooni Cummings testified

7  was for those two rings that she got for herself and Ms. Macrina.

8          It's just simply not plausible that he would have asked

9  the Commissioner of Watershed to do this for him when he

10 specifically sent an entire person over there to take care of

11 Ms. Macrina.

12         Moving to the next bribe, defendant has conceded that

13 the more than $5200 spent on the shopping and jewelry in Dubai was

14 a bribe.  So I won't go into too much detail on that.

15         And then finally there is the $1,000 landscaping by Joe

16 Vollero.  Joe Vollero was clear in his testimony that Jeff Jafari

17 paid him to do landscaping for Ms. Macrina.  There was also

18 evidence and he testified that Ms. Macrina separately paid him for

19 a retaining wall and other work, but he was clear.  Jeff Jafari

20 paid him for that landscaping work.

21         So in total that's over -- that's between $40,000 and

22 less than $97,000 -- or $95,000 in line with the PSR's calculation

23 of the loss amount.

24         Therefore, the government's position is that paragraph

25 44 is correctly calculated.

1        Also, paragraph 43 that discusses the number of bribes

2    and applies the two-level enhancement, that enhancement is

3    correct.  There were multiple bribes.  Jo Ann Macrina accepted

4    those bribes in the form of cashier's checks, checks, cash,

5    jewelry, shopping, and that promise of future employment.  In

6    exchange, she assisted Mr. Jafari with multiple contracts and task

7    orders.

8        The FC-7383 contract that she influenced the selection.

9    The initial evaluators said this is not going to go to Jeff

10   Jafari.  He was ranked toward the bottom.  She then had a new

11   evaluation take place.  She, herself, participated in that

12   evaluation, which was unusual for a commissioner.  And after that

13   Jeff Jafari was awarded that huge lucrative contract.

14       She also steered the Peyton Center design contract,

15   which included that water study that was never finished to Jeff

16   Jafari's company, and the Mims Park design project she also

17   awarded to Jeff Jafari.  All of those constitute more than one

18   bribe, and it's the government's position that probation correctly

19   applied that two-level enhancement.

20       THE COURT:  Thank you.

21       MS. PORTER:  Thank you, Judge.

22       THE COURT:  Mr. Kish, the last word is yours.

23       MR. KISH:  Briefly, Judge.

24       The government points to letters in what was the trial

25   exhibit, I think, No. 150 the government had that Jafari wrote to

1    the City of Atlanta denying that Ms. Macrina worked for him.

2    There's no evidence Ms. Macrina was aware of those letters or what

3    Jafari was doing or why he was doing it.  So that can't show the

4    inauthenticity of the work she performed in order to earn the

5    $30,000.  Why Jafari did what Jafari did, only Jafari can say.

6    But without any evidence that Ms. Macrina was aware of what Jafari

7    was saying, that doesn't show that her money was not earned from

8    the company.

9            Second, the government points out that Ms. Macrina on

10   her own financial disclosure statement, which was their Exhibit

11   17, did not include the income that she received from Jafari.  And

12   the Court allowed the jury to hear about that, and we objected

13   about the ethics stuff and we're not rearguing that.  But not

14   putting something on a disclosure statement is very different from

15   proof that money was not earned.  Those are sort of apples and

16   oranges.  So I don't think that exhibit helps the government in

17   the argument that they are making.

18           The government says when it comes to the statements by

19   Ms. Macrina to the agents that the money she got from Jafari was

20   for gifts for Mrs. Jafari, and the government just said to you a

21   second ago, there is no evidence that it was for gifts.  Again,

22   that is flipping the burden of proof.  We don't have to prove it

23   was or was not for a gift.  We're simply pointing out the

24   government doesn't have any evidence to refute that it was for a

25   gift.  That's the only evidence you have in this record from which

1  you can make these sentencing decisions.

2          When it comes to the employment issue, the $30,000 from

3  PRAD, it's important to remember, also, the government objected to

4  a lot of our evidence.  It's still something you could consider,

5  though.  There is a lot more than what was presented to the jury,

6  and we moved to admit those documents.  They're part of our

7  record, because the Court said we couldn't use them.  So it's not

8  just what is in the record before the jury, it's also what is in

9  the entire record.  And it's telling that the government objected

10  to it because, obviously, they took the position that it was

11  showing that she was employed.  That's why they said it was not

12  admissible.

13          Finally, on the question of the burden of proof, which

14  to me is the way to resolve these issues, the government has to

15  prove she did not earn the money when it comes to the $30,000.  We

16  don't have to prove that she did.  We just put that in evidence in

17  order to show what we believe the true set of facts were.

18          When you come back to the burden of proof, we think that

19  there is insufficient evidence to support the use of these

20  specific offense characteristics.

21          THE COURT:  Thank you, Mr. Kish.

22          In looking at and taking into consideration the argument

23  coming from the defense and the government, the Court has heard

24  you-all's argument, the Court would also like to remind everybody,

25  at trial -- I sat through the whole trial.  I heard all of the

1  evidence.  And listening to the evidence, Mr. Kish, I'm going to

2  respectfully disagree with you on both of your objections.  I find

3  the government has met their burden, and the Court will overrule

4  the objections and allow the enhancement for the number of bribes,

5  a two-level enhancement and a six-level enhancement for the amount

6  of payments.  Mr. Kish, I note your objections to my rulings.

7          At this time the Court will announce the sentencing

8  options.  Count 1, conspiracy to commit bribery, 18 U.S.C. § 371,

9  a Class D felony, is five years imprisonment and $250,000 fine.

10          For Count 2, bribery under 18 U.S.C. § 666(a)(1)(B), 10

11 years imprisonment and $250,000 fine.  This is a jury trial.

12 There is no mandatory minimum.  The offense level that the Court

13 has found is a 26.  The criminal history category is a 1.  The

14 custody guideline range the Court has found is 63 to 78 months.

15 And the fine guideline range is $25,000 to $250,000, and

16 restitution is $40,000.  Special assessment of $200.  Cost of

17 confine annually is $44,258.  Cost of supervision annually is

18 $4,454.  Supervised release for Count 1 and 2 is one and three

19 years.

20          Mr. Kish, I have read your sentencing memorandum, I have

21 read the letters you sent me, but I'm prepared to hear any witness

22 you want to present this morning.  I'll hear argument from you.

23 And if Ms. Macrina wishes to allocute, I will hear from her as

24 well.  Then I'll hear from the government, and then I'll come back

25 to you for final word.

 1          MR. KISH:  Yes, sir.

 2          We're not going to ask anybody else to talk to you this

 3     morning.  We're going to introduce some people to you.

 4          Ms. Macrina does want to address the Court at some

 5     point.

 6          THE COURT:  Yes, sir.

 7          MR. KISH:  Before we get to that, I would like to make a

 8     few comments based on the sentencing memorandum.

 9          I hate this case so much.  But what I hate and don't

10     hate is not relevant.  What is relevant is the 3553(a) factors.

11     You have to consider the offense.  You have to consider the

12     offender.  You've got to consider the guidelines.  You've got to

13     consider sentencing disparities.  There is a lot to consider.

14     This is obviously a difficult case for everybody involved.  I have

15     never before and I certainly never will have a case like this

16     where a person who is convicted of bribery told the government

17     about the bribery for years.  Told them about all of it.

18          Judge, we didn't burden the Court with the 24 interviews

19     and all the stuff, but I was getting ready to list all the people

20     she named early on while she's working for Jafari who appeared in

21     front of you who pled guilty.  She gave them the entire background

22     of how the city worked, how it operates, what one contract means.

23     She is the one who brought up to them the 7383 contract that now

24     has led her sitting between Mr. Bouchard and I.  But it's a fact.

25     The jury decided that somewhere along the way, this person, whose

1  life you learned more about from the 27 letters than anything I

2  could ever say, this person somehow accepted a bribe.  That's what

3  the jury decided.  I don't know what they focused on, because we

4  didn't have a special verdict form.  But we know they made that

5  finding.  But when it comes to the offense and the offender,

6  here's what I do know.  There are people out there right now who

7  have been and are continuing to bribe City of Atlanta officials

8  who are laughing that Ms. Macrina is the person sitting here.

9  They are laughing.

10         The government got a conviction.  The government decided

11  to make a case, and the jury decided it was sufficient.  But

12  putting this lady into custody is inappropriate in our view based

13  on the offense, her background, the guidelines, and the array of

14  the way these cases are handled.

15         I mean, obviously different judges view different cases

16  differently.  Judge Cohen, as we pointed out in his sentencing

17  memorandum, imposed a sentence of probation on what to us at least

18  seems to be a very similar case.  That doesn't mean any control to

19  this Court.  But it just points out that other judges take a look

20  closely, as they do in all cases, at the facts of the situation.

21  And under 3553(a), there are a lot of options available to the

22  Court.

23         We also pointed out that Ms. Macrina has, obviously,

24  been punished.  When she was indicted, she lost a job.

25         She was helping to run, as she has done her entire

1 career, the utilities department for the City of Daytona Beach.

2 Every time she applies for a job since that day in June of 2020

3 when she was indicted, every time she applies for a job, they say

4 we can't hire you because you have a prior -- because you're under

5 indictment.  Jobs like working at Whole Foods won't hire her.

6 She's indebted for the rest of her life.  She is, you know, my

7 age.  The Court's age.  She has been punished significantly.  And

8 we ask the Court to take that into account.

9         There are a lot of people that wrote letters to the

10 Court.  There are a lot of people who showed up here today.  I

11 want to introduce a few of them.

12         If you will stand up when I call your name.  Scott

13 Siverson.  Scott is a lawyer in Florida.  He's a family friend.

14 He's provided legal advice to Ms. Macrina and her family.  Also

15 present is Emily Andosca.  She's is the young lady who wrote what

16 I've been lovingly calling the Aunt Jo letter to the Court.

17         THE COURT:  Good letter.

18         MR. KISH:  Emily's father Rick is here.  Rick and Nancy

19 Webb, who you saw all during the trial, who is our paralegal, are

20 the parents of Emily.

21         I thought Allen Barnes was going to be here, but I don't

22 see Allen.  Allen was a government witness, remember, and he wrote

23 you a letter of support for Ms. Macrina.  I never had that happen

24 in a trial.

25         We thought Jay Ash was going to be here.  Jay was the

 1 only evaluator -- there he is.  Good morning.  Jay -- you know, we

 2 called him.  He was a trial witness.  And he, I believe, was the

 3 only one of the people in the room who was one of the evaluators,

 4 remember, when we talked about the contract -- who testified.  And

 5 he said, I didn't feel pressured at all to do anything by

 6 Ms. Macrina.

 7           And then, as I mentioned earlier, Ms. Webb is here.

 8           And here comes -- here is Allen Barnes right there,

 9 walking in right on time as we're talking about him.

10           I just wanted the record to show and the Court to know

11 who all these people are.

12           Ms. Macrina would like to address the Court.

13           THE COURT:  I'll hear from her.

14           MR. KISH:  Where should we do that, Your Honor?

15           THE COURT:  If she's speaking into the mic, I think

16 Ms. Viola can hear her from there.

17           MR. KISH:  Yes, sir.

18           THE COURT:  We need her to stand, though.

19           THE DEFENDANT:  Thank you, Your Honor, for this

20 opportunity to speak.

21           I have dedicated my life to my family, my friends, and

22 in public service.  I have worked hard all of my life, and my

23 first serious job was at age 16 when I worked for Nassau Research

24 Center.  I worked my way through college cleaning houses,

25 waitressing, and even loading and unloading package cars for UPS.

1  And later on in my career, I put in countless hours managing

2  departments and managing projects too numerous to even name.

3          In my 48-year career, I worked in an industry that I

4  love and I believe in.  I worked with authorities and many

5  colleagues to protect the public's health and safety, and also to

6  improve the environment.

7          I've mentored young people to inspire them to put their

8  talents to use for the betterment of society.  And all of this, it

9  was a privilege to serve, to serve everyone in my life, and to

10  serve the communities I lived and worked in.  And I continue to do

11  so.

12          So I ask you to please consider my life's work when you

13  make your decision.

14          THE COURT:  Thank you, ma'am.

15          Mr. Kitchens.

16          MR. KITCHENS:  Thank you, Your Honor.

17          Your Honor, we, of course, also read all of the 27

18  letters that were submitted, and it is clear from those letters

19  that Ms. Macrina is a loving mother, that she was a respected

20  public official in many ways, and that she has support of family

21  members and friends who love her as well.  I think the people who

22  showed up today is a testament to that.  It is clear that

23  Ms. Macrina has many supporters, and she's made an impact in their

24  lives.

25          As the Court well knows that the charges and the

1    conviction in this case does not erase good deeds that she may

2    have done in the past, nor does it make Ms. Macrina a bad person.

3         But it is the truth, as the Court knows all too well and

4    sees too often, that even generally law-abiding, productive

5    members of society can commit egregious crimes that have a

6    profound impact on the community.  And that's what we have here.

7         And that was what ultimately leaves a difficult task for

8    this Court, where you have to balance the history and

9    characteristics of the defendant and a life generally well-led and

10   well-lived with the searing damage that the defendant left on the

11   city that she left behind, the City of Atlanta.

12        It's also the task of the Court to look not only at the

13   nature of the defendant, but also to look and try to determine an

14   appropriate and fitting punishment based on the needs of the

15   community.  And I think the fair consideration of all of the

16   Section 3553(a) factors and the needs of the community calls for a

17   substantial prison sentence in this case.

18        The government's recommendation is the middle of the

19   guidelines.  We believe that the middle of the guidelines,

20   roughly, around 70 months, takes into account Ms. Macrina's

21   history and characteristic, but is ultimately a just sentence in

22   light of the seriousness of the offense, the need for deterrence,

23   and Ms. Macrina's conduct overall.  So let me address a few of

24   those factors in more depth.

25        First in terms of the seriousness of the offense.  There

1    are several aspects of this.

2          First, the fact that this was a corrupt scheme executed

3    with deliberation over a lengthy period of time.

4          Second was the sophistication of the scheme itself.

5          And third is the gravity of the harm to the City of

6    Atlanta and various other victims in this case.

7          Now, I know that Ms. Macrina's sentencing memo casts

8    this as a mistake, that somewhere along the line that the jury

9    found that she somewhere made an error somewhere.  I believe that

10   the evidence that this Court heard through that trial told a far

11   different story.  What it showed was that this was not a single

12   isolated mistake or single isolated act of corruption, but it was

13   a corrupt scheme perpetrated over a series of months and multiple

14   contracts and multiple task orders.

15         We address in the guidelines argument really the sheer

16   variety and number of bribes that were at issue here.  And in

17   addition to what's telling about the bribes that Ms. Macrina

18   accepted, I think it is also telling the bribes that Ms. Macrina

19   was offered but did not accept.  One of those, you may recall

20   testimony in Ms. Macrina's statement to the agents that she noted

21   that Jeff Jafari at some point offered her a car.  What's telling

22   about that is not so much that she didn't accept it, which is

23   good, but it's telling, I think, the simple fact that she was even

24   offered a car.  A contractor wouldn't offer something like a car

25   unless they thought there was a reasonable odd, a reasonable

1  chance that a public official would actually accept that.  And you

2  could understand in light of the repeated bribes that Ms. Macrina

3  took, why Jeff Jafari had that belief and understanding that being

4  offered a car was something that Ms. Macrina very well might

5  accept.

6          The fact is when you look at each and every one of those

7  bribes over time, Ms. Macrina could have stopped at any point and

8  minimized the harm to the city and those she served.  Imagine, for

9  example, if Ms. Macrina returned from her trip and found that Mr.

10  Vollero had performed landscaping services at her house that had

11  been paid by Jeff Jafari.  Let's assume that Ms. Macrina decided

12  to take a different path and she decided to stop there.  And she

13  told -- let's assume under this world she would have told Mr.

14  Jafari she's not going to accept that, any gifts from a government

15  contractor, and would have repaid Mr. Jafari for that landscaping.

16          That would be, I think, a very significant difference in

17  terms of how things actually played out and what we saw

18  Ms. Macrina actually do.  Because the reality is and what we saw

19  at trial was that Ms. Macrina made a very starkly different

20  choice.  She repeatedly chose to accept bribes from both Mr.

21  Jafari and Ms. Cummings.  She took bribes in the form of cash,

22  checks, jewelry, and the promise of a future job, a lucrative

23  position where she was told, essentially, she'd be handed the keys

24  to the kingdom at PRAD and would take over when Jeff Jafari

25  retired.

1          At some point those bribes over time shifted from just

2    being benefits to a sense of entitlement for Ms. Macrina, where

3    she took it as a given that Jeff Jafari and JP2 would compensate

4    her appropriately for the wildly inappropriate steps she took to

5    favor Jeff Jafari's company in awarding the City of Atlanta work.

6    She never made a decision to stop.  She continued to accept

7    benefits from Jeff Jafari essentially right up to the date that

8    she was fired by the City of Atlanta.

9          This was a corrupt scheme perpetrated in so many forms

10   over so many months that it demands a higher sentence than a

11   one-time acceptance of a bribe.

12         The second aspect of the seriousness of the offense is

13   the sophistication of the scheme.  And there is no question from

14   the letters, the background, the PSR that Ms. Macrina is a deeply

15   intelligent and accomplished person.  She was a significantly

16   accomplished engineer.  Her talent ultimately played out at trial

17   in terms of her skilled manipulation of the system to perpetrate

18   the scheme to benefit Jeff Jafari's company.  We saw this in

19   really two ways.

20         First was in the execution of the scheme on a Friday;

21   and second was in covering it up on the back end.

22         On the front end, the evidence of her sophistication

23   was, perhaps, starkest with all of the evidence the Court saw in

24   terms of the steps that Ms. Macrina took to engineer and to pull

25   all of the levers of power to lift JP2 from being ranked eighth in

1  the A & E contract rankings, where it would not have received the

2  contract, all the way to second in the rankings.

3       So if you recall, briefly, all the steps that the

4  witness testified and what you saw in the evidence that

5  Ms. Macrina took.  She noted and told the agents that she

6  personally came up with the idea for asking for interviews as part

7  of that A & E evaluation even though it was not required under the

8  contract, and interviews had not been requested by the evaluation

9  committee.  And she told the FBI she did this because she knew it

10 would wipe the slate clean in terms of the scores that ranked JP2

11 eighth among the contractors and out of the ability to get a

12 contract.

13      You heard testimony that she pressed George Ajy, an

14 expert in the field, to participate in the interview to assist JP2

15 when those interviews were conducted during this second evaluation

16 even though George Ajy was part of the competing bid.

17      You also heard of an instance where she reconstituted

18 the evaluation committee itself to take really the -- you know,

19 all of those unprecedented stuff, of putting herself personally, a

20 sitting department commissioner, on that evaluation committee, as

21 well as putting in her hand-selected employee Jay Ash to serve on

22 that committee.  And then you heard the testimony from Kathryn

23 Vernet, as well as the score sheets that showed that when she sat

24 on that evaluation committee, she ranked JP2 consistently the

25 highest among all of the evaluators.  And the net effect of that,

1   and you recall Katherine Vernet's testimony differed from Jay

2   Ash's testimony on this point.

3         But the score sheets tell a very clear story, that

4   because she ranked JP2 the highest when they had to do this way of

5   coming up with an average score and agreed-upon score in those

6   categories, that had the net effect of causing other evaluators to

7   lift their scores for JP2.  And that's actually what you see in

8   the score sheets.  Where there are crossed-out scores, other

9   evaluators raised their scores based on Ms. Macrina's highest

10  scores for JP2.

11        Those steps required not only contact and coordination

12  with similarly corruptible officials like Adam Smith that this

13  Court has already sentenced, but also a deep insight into how city

14  contracting worked and the willingness to exploit it.  And that

15  level of sophistication deserves higher punishment.

16        The back end showed a similar level of sophistication

17  through the steps that Ms. Macrina took to conceal the corruption.

18        You saw evidence and have heard again this morning about

19  how Ms. Macrina lied to the City of Atlanta on her financial

20  disclosure forms to hide the income she was receiving from PRAD

21  after leaving the city.

22        You heard testimony that she lied to her friend Allen

23  Barnes about the nature of her work for PRAD.  Of course, as the

24  Court knows, Mr. Barnes wrote a letter of support for Ms. Macrina,

25  which we read as well.  He testified, I think, and there was no

1  mistake about this in his testimony, about the depth of his

2  friendship at trial.  He noted that they spoke really on a weekly

3  basis.  They were very close friends -- remain to this day, as far

4  as I know, very close friends.  And importantly he noted

5  consistently with what he, you know, had previously told the grand

6  jury, that when he found out Jo Ann Macrina was working for Jeff

7  Jafari, he asked her about the nature of the work.  And all that

8  she told him was it had nothing to do with the City of Atlanta

9  work.  And you remember from those documents we saw, that was far

10  from the truth.

11          She lied to her own friend, Allen Barnes, about the

12  nature of what she did for Jeff Jafari.  And I'm sad to say, I

13  don't know until this very moment with Mr. Barnes sitting in the

14  back, if he was aware that she personally lied to him.

15          You also heard extensive testimony about the lies that

16  Ms. Macrina told the FBI about the benefits that she received from

17  Jeff Jafari, and I'll talk about this a little later.

18          Ultimately, each of those lies was a manipulation of

19  those who trusted her and believed in her.

20          Ms. Macrina is someone who is blessed with many talents.

21  She's a very intelligent person.  But her willingness to use those

22  talents for corrupt ends underscores the need for a substantial

23  prison sentence in this case.

24          The third aspect of the seriousness of the offense in

25  this matter I think that is worth focusing on is really the nature

1   of the harm to the victims.  One nature of that harm is -- really

2   you could look at the gist of the dollar figure, the amount of

3   work that Jeff Jafari's company received was tied at least in part

4   to Ms. Macrina's efforts to steer work and contracts to him.  I

5   think the number that we noted in the sentencing memo was,

6   roughly, about $31 million in work.  That was based on task orders

7   that Jeff Jafari received after being awarded the A & E contract

8   when he would not have been one of the A & E vendors if not for

9   Ms. Macrina's intervention.  And, also the Peyton Center design

10  contract -- that single-source contract that Mr. Bocarro thought

11  was so unusual and did not make any sense, where he also -- as a

12  result Mr. Jafari received millions of dollars from that contract.

13          $31 million is a colossal sum of money.  It far outpaced

14  other City of Atlanta contractors that were involved in the same

15  time period for the nature of this work.  To give a sense of the

16  scale of this, this was larger revenue to JP2, significantly

17  larger revenue than the sums that were awarded to E.R. Mitchell's

18  company and C. P. Richards' company when Ms. Bickers received

19  millions of dollars in bribes.

20          I think leaving aside the dollar amounts, another

21  measure is really the depth of the betrayal and the abuse of the

22  power here by Ms. Macrina.  She was not just any ordinary city

23  official, she was a cabinet member.  She was a department head

24  running a department of more than 1,000 employees with an annual

25  budget of, roughly, $600 million or more.  She was given an

 1   extremely serious mission to provide for the daily water needs for
 2   millions of Atlantans, and to safeguard the future supply for the
 3   city for decades.  That called for someone incorruptible.  Instead
 4   what the city received was Ms. Macrina who took bribe after bribe
 5   and then tried to cover it up.
 6          But, perhaps, a truer reflection of the harm in this
 7   case comes not from those numbers or really from that depth of the
 8   betrayal and abuse of trust, but from the stories of the citizens
 9   of Atlanta and the companies who suffered as a result of
10   Ms. Macrina's conduct in this case.  One of those victims, in a
11   sense, was the contractor who lost out because Ms. Macrina steered
12   the A & E contract to Jeff Jafari's company.
13          When Ms. Macrina took steps to scrap those initial
14   scores and then personally served on the evaluation committee, the
15   net result of that was that PRAD and JP2 received one of those
16   treasured spots as an on-call contractor with the A & E contract
17   as opposed to another contractor, a deserving contractor that was
18   bumped out of that spot.  That contractor, as we heard, the
19   significant amount of work that was put into each of those
20   applications by these contractors and the significant amount of
21   effort that was put in, that contractor didn't have a chance to
22   recruit that work for applying for that contract, because they
23   ultimately were competing in an unfair playing field.
24          You can imagine the lost revenue, the lost jobs, the
25   lost financial stability when that contractor didn't have that

1  steady stream of revenue from the A & E contract that Jeff

2  Jafari's company unjustly received based on Ms. Macrina's

3  intervention in this case.  That contractor is not a victim under

4  the guidelines, but nonetheless they suffered a significant loss.

5          Other victims in this case were the City of Atlanta

6  employees themselves.  And I know the Court at another sentencing

7  spoke of the untold victims of city corruption and the toll that

8  cases like this has on them.  The damage to the work and

9  reputations of hundreds of honest hard-working city employes is a

10  story that is not often told.  It's important to recognize that

11  the large majority of workers for the City of Atlanta who wake up

12  every day to serve the citizens and do the right thing for the

13  City of Atlanta, and that story is lost sometimes when we have

14  conduct like the egregious conduct like we see here.

15          We heard from some of those employees at trial, in fact.

16  I can assure you that none of those witnesses necessarily wanted

17  to testify.  This wasn't anything that they wanted to do.  But

18  they spoke the truth, because that was the right thing to do.  And

19  serving their job was the right thing to do.

20          The net result, unfortunately, from a sad episode like

21  what happened with Ms. Macrina and her acceptance of bribes, is

22  that the city employees and those honest employees' work will

23  continue to be doubted, and their reputations will be besmirched

24  through no fault of their own as the city continues to read about

25  a Department of Watershed Management commissioner who accepted

1  bribes at the very top to steer the City of Atlanta work to a

2  corrupt contractor.

3       As the Court recognized, those honest employees take a

4  very hard blow in the eyes of the public based on the greedy

5  decisions that Ms. Macrina made to abandon her duties in favor of

6  her own self-interest.  Those city employees, those honest

7  hard-working employees, again, are not victims under the

8  guidelines, but their loss is still felt in profound ways.

9       And lastly and no less importantly than all those other

10  victims, are the City of Atlanta residents themselves who, of

11  course, paid a hidden toll from every project, task order, or

12  contract that was unfairly awarded to Jeff Jafari's company over a

13  more-deserving contractor.

14       To put some sense of money on this, I think our

15  sentencing memo noted and may have reminded the Court of the

16  testimony from Kim Ajy that noted that JP2 would regularly charge

17  a 12-percent markup to the City of Atlanta for its work.  So there

18  may have been some additional costs from steering work to Jeff

19  Jafari.

20       But I think beyond just that dollars and cents is the

21  level of service provided.  And I think while Ms. Macrina chooses

22  to focus on the water supply contract and the legitimately good

23  work that Jeff Jafari's company did for that reservoir, I think

24  what is missed there is really the downright negligent work that

25  we heard about that JP2 did with other work it received for the

1    city.  And what comes to mind and, perhaps, most profoundly is the

2    Mims Park task order and what happened there.

3          You may recall the testimony from Rob Bocarro that that

4    Mims Park contract was designed to not only provide a central

5    green space for the community in Vine City, very close to,

6    obviously, the Mercedes-Benz stadium, but also flood relief for

7    that hardscrabble community over there that is of limited means.

8          And he noted that the problem was that when big storms

9    hit, that area really stood in the floodplain.  What would happen

10   would be that those houses, basically, would be under water.  That

11   was hugely damaging and, frankly, unacceptable that in a city like

12   this that a community has to suffer through improper flood

13   control.  And Mims Park was designed to provide the solution to

14   that.  And because of this, time was of the absolute essence for

15   the completion of this park.  It was supposed to be from the

16   issuance of the task order to the completion of the project -- not

17   just the design, but the actual shovels in the ground, building,

18   everything was supposed to be one year for completion.

19         But you heard about what ultimately happened.  Rob

20   Bocarro noted there was an existing vendor who was already doing

21   design work at Mims Park, Arcadias, and Rob Bocarro thought they

22   had done their work well.  But that vendor was not given a chance

23   to bid on the work.  Instead, Ms. Macrina steered this project,

24   the next phase of the design project to JP2.

25         You heard from multiple different witnesses, and I think

the defense drew out from testimony themselves about the danger of really changing a horse midstream or mid-race.  I can't remember. I always mix up the metaphor.  But that's exactly what happened here based on Ms. Macrina's own express decision to change from Arcadias to JP2.  And what's particularly troubling is Rob Bocarro noted that JP2 was spending so much resources and so much of its time on that water supply contract, that it really was not -- did not have adequate resources to do something where time was of the essence and to serve this community, to give them the flood relief that they needed.

So the net result was when that transition happened, there was actually built into the process months of delay where Arcadias had to get JP2 up to speed on the design work it had already done and transfer the project over.

And then, of course, you heard that for a project where time was of the essence and the city sought to complete it within one year, that that park was completed four years after deadline. Those four years, additional years of families in Vine City, fearing the loss of their homes, their possessions, and their livelihoods.

I'm not saying Ms. Macrina was to blame for all of those delays, delays happen, but those residents in Vine city deserve better, and they deserved a contractor that was going to deliver services at least close to the time projected, not corruption that built delay upon delay in the delivery of the services that they

1  so desperately needed.

2       I think really the seriousness of the harm ties into

3  another 3553(a) factor, and I'll be brief on this, and that's the

4  need for deterrence.  I don't think there is a significant need

5  for really specific deterrence in the sense that I don't think

6  Ms. Macrina is likely to ever have a position of authority similar

7  to this again, where she would be in a similar position to accept

8  bribes.  But it is nonetheless, I think, concerning when I read

9  the memo and read some of the letters to see some of the lack of

10 apparent remorse for some of the conduct that did take place here.

11      There is no doubt, of course, I'm sure that Ms. Macrina

12 is sorry about the impact that this has had on her family and

13 friends, and the prosecution has had.  But I think the sentencing

14 memo and those letters also show really a story that is divorced

15 from what the Court heard during that trial.

16      There were terms that were thrown around that the jury

17 must have found that there was a mistake of some sort, and I think

18 there was a phrase in multiple letters that it was a travesty of

19 justice that the jury found this.  But I think the Court observed

20 the same thing that we did about this jury.  I think those terms

21 really disparage the hard work that they did.

22      The reality is that that jury met her every day, they

23 listened carefully to the testimony, they took extensive notes,

24 and at the end of the process they deliberated and they convicted

25 her on both counts.  There is nothing suggesting that the jury did

1   anything but take their jobs to the utmost seriousness and

2   recognized the gravity of the situation.

3          We, obviously, in this job, we see many letters from

4   friends and supporters that note that the conduct that a defendant

5   may have been convicted of, whether by plea or by trial, is

6   incongruous with the conduct that they know about that person.

7   And that's common that we see that, that the criminal conduct that

8   is alleged is a departure from what they've seen.

9          But I think what was striking about some of the letters

10  in this case were so many statements about the doubts in the

11  verdict itself.  And this was coming from supporters who didn't

12  attend one minute of the trial.  They didn't see one shred of the

13  evidence that was presented at the trial, but they come in with

14  adamant opinions that this was some sort of travesty or

15  mischaracter of justice disparaging the work of this jury.

16         Obviously, I can't hold Ms. Macrina accountable for the

17  words of her supporters, but those supporters develop those views

18  from somewhere that this was a travesty of justice.

19         Given the nature of this harm, I think really the

20  importance of general deterrence is what is so significant here.

21  That's because of the nature of this underlying defense.  You

22  have, of course, extensive Eleventh Circuit authority from cases

23  like *Coleman* and *Martin* and the *Howard* case noting the importance

24  of general deterrence in kind of white collar cases, because these

25  are offenses that are done with deliberation, and we don't,

1    obviously, have resources at the government to investigate

2    every -- and capture every aspect of corruption that happens

3    within city government.

4            But it is particularly important here when we did

5    identify an area of corruption, and this was coming at really

6    among the highest level of the city, in terms of as a department

7    head of the city.

8            The defendant abused the trust of the citizens, failed

9    to put their needs first, and she instead made decisions that

10   resulted in an unlevel playing field.  The justice system simply

11   cannot tolerate that level of corruption of that magnitude

12   affecting so many victims from the city, residents to the

13   employees to the other contractors in so many profound ways.  That

14   corruption erodes and eats at the public's faith in government and

15   ultimately the functioning and the proper functioning of a

16   democracy.

17           A sentence in this case needs to send an appropriate

18   strong message that corruption like this will not be tolerated and

19   people cannot abuse the trust placed in them for personal gain.

20           Now I'll address a few arguments from Ms. Macrina's

21   sentencing memo itself.

22           I think we heard again from Mr. Kish this morning a

23   request that Ms. Macrina should receive a noncustodial sentence,

24   and that is certainly what their memo calls for.  Just to put in

25   range an idea in terms of -- just to put it in terms of the

1  sentencing table, what that really is calling for is an order to

2  really get Ms. Macrina into a sentencing range where probation is

3  an option.  She'd have to be done in Zone B.  So at the lowest,

4  she would be looking at an offense level of 11 instead of 26.

5          So what they are calling for is a 15-level downward

6  variance from the sentencing guidelines that are actually

7  applicable in this case.  That's extraordinary by any measure and

8  beyond extraordinary given the facts of the egregious conduct in

9  this case.

10          So let's look at some of the arguments they cite to

11  support this extraordinary variance that they're calling for.

12          There I think most notably is this claim that

13  Ms. Macrina was seeking to rid out corruption by approaching the

14  FBI.  I think, again, the testimony at trial is at odds with that

15  very characterization.  It is true that Ms. Macrina met with the

16  FBI the day after her termination.  And it is true that

17  Ms. Macrina provided background information about how the city

18  worked and certain aspects of the corruption in the city.  But I

19  think the testimony was also clear, as the agents noted in their

20  testimony and the full scope of their relationship and their

21  conversations with Ms. Macrina, that Ms. Macrina wasn't blowing

22  the whistle.  She was blowing smoke.  Ultimately, she was blowing

23  a smoke screen to hide what she herself was doing for the city.

24          Specifically, I think the Court remembers that she

25  volunteered nothing related to Mr. Jafari's corruption in the

1  A & E contract until the FBI brought it up.  This was months after

2  she first met with the FBI in 2016.  And when the FBI did raise

3  the A & E contract and Mr. Jafari's role and Adam Smith, she

4  denied receiving anything from Jeff Jafari or other vendors.  In

5  fact, as Agent Parker and Agent Davis testified, she repeatedly

6  denied receiving anything from Jeff Jafari during this contract

7  right up until her final interviews in 2019.  So this went on for

8  years where Ms. Macrina denied receiving anything.

9       Ms. Macrina only confessed to receiving benefits, and I

10  think the Court noted probably the turn in February 2019, happened

11  when the agents noted that if she were to testify at a future

12  trial against Jeff Jafari, Jeff Jafari was going to know exactly

13  what happened between the two of them, and he would have the

14  opportunity to cross-examine her.  And so if she had anything to

15  share that she hadn't previously shared, now is the time to tell

16  it.  And it was then when she realized Jeff Jafari knew well and

17  good what had happened with Jo Ann Macrina, that she came clean --

18  at least in a sense.

19       I know the Court knows well the old saying you keep your

20  friends close and you keep your enemies closer.  And that

21  ultimately, I think, when you look at what happened during those

22  series of contacts with the FBI, is exactly what happened.  And,

23  frankly, it worked right up to 2019; the FBI trusted Jo

24  Ann Macrina.  The FBI, along with so many other people, was

25  manipulated by her until they finally realized what Ms. Macrina

1  had done and what she -- you know, the harm that she had actually

2  done in this case.

3      There is also a claim that Ms. Macrina suffered

4  financial and professional consequences from the charges, and that

5  there is a low risk of recidivism.  I think as the Court knows,

6  the same arguments could apply to nearly every white collared

7  defendant -- everyone accused of fraud, corruption, whatever.

8  Many of those defendants have also, just like Jo Ann Macrina, have

9  no criminal history.  There is a limited need for specific

10  deterrence in those cases.  Many of those defendants lose their

11  jobs, lose their well-compensated positions.  They may have other

12  professional repercussions, like losing professional licenses.

13  But the fact that white collared defendants like Jo Ann Macrina in

14  some way have more to lose than other defendants of lesser means

15  and fewer advantages -- than defendants that have fewer

16  advantages, doesn't mean that wealthier defendants and better

17  educated defendants are entitled to substantial downward variance.

18  In fact, to the contrary, the Eleventh Circuit repeatedly

19  recognized that defendants like Jo Ann Macrina that are better

20  educated, have more resources are more culpable and more deserving

21  of substantial sentencing because they committed criminal acts

22  like this with deliberation and did so out of greed, not crimes

23  out of need.

24      The Eleventh Circuit I know, as the Court is also very

25  familiar from the *Coleman* case, cautioned that judges must resist

1    the temptation when you're sentencing a defendant from really a

2    professional class to somehow treat them differently than

3    defendants that come from very different and more difficult

4    circumstances.  And that's what we're faced with here.

5            And lastly, I think the defendants note a claim where

6    they -- they note the need to avoid unwarranted sentencing

7    disparities with the one case they cited, *Sharon Barnes Sutton*,

8    and that came up again this morning.

9            I think it's telling by itself that Ms. Macrina did not

10   look to other defendants that were sentenced by this Court or that

11   have, you know, engaged in other City of Atlanta corruption.

12           The key when you're making an argument, of course, as

13   the Courts knows about looking at unwarranted sentencing

14   disparities, is to compare, really, defendants of similar records

15   and similar conduct.  You want an apples to apples comparison.

16           I think Mr. Kish this morning earlier in his argument

17   noted that I guess an argument in his view was comparing apples to

18   oranges.  I'll go a step further.  I think when you compare

19   Ms. Macrina to Sharon Barnes Sutton, it's more like comparing

20   apples to Greek yogurt.  You're not even in the same aisle of the

21   grocery store when you're comparing the two.

22           Ms. Macrina provided a threadbare description of that

23   case, so let me give you a little more context about what was

24   alleged in that case.

25           THE COURT:  I can save you some time.  I know about that

1  case quite well.

2          MR. KITCHENS:  Exactly.  I can imagine.  So I will not

3  go into depth.  As the Court knows, there were two bribes accepted

4  or two payments of $500 received.  That is a far cry from the

5  evidence that was presented in this particular case.  The result

6  of that is -- Ms. Macrina notes is that Ms. Barnes Sutton was

7  facing a guidelines range of 27 to 33 months.  So three to four

8  years lower than what Ms. Macrina is looking at.  In addition to

9  that, Ms. Barnes Sutton expressed remorse at sentencing for what

10  she had done, expressed regret for ever accepting those two

11  payments.  She pointed to other DeKalb commissioners who had also

12  committed corrupt acts and received little or no prison time as

13  being a factor for why she shouldn't deserve a significant prison

14  time.

15          And also, as I think the Court may be aware, she

16  presented under seal and was noted at least in public dockets,

17  that there were health conditions that were at issue and may have

18  been a factor in the Court's decision in making as well.

19          Simply stated, it's not close to a similarly situated

20  defendant.  It's not close to a similarly situated circumstance as

21  what we're faced with Ms. Macrina.  There is nothing that would

22  create an unwarranted sentencing disparity by giving Ms. Macrina

23  an appropriate sentence in this case, which is a guideline

24  sentence in the middle of the range.

25          Lastly, I'll just note really that 70-month sentence by

1   itself, in the middle of the guidelines, is, frankly, lenient

2   considering what the guidelines could have been.  I think our

3   sentencing memo noted the significant, really conservative or very

4   cautious, I guess, calculation of the loss amount at issue here

5   compared to what could have been imposed.

6          What we recommend and what probation ultimately applied

7   as well was for the Court to determine the amount of harm and

8   corruption here based on the amount and the value of the bribe

9   received rather than, and what the alternative calculation could

10  be, would be the amount of the benefit received for -- by the

11  corrupt contractor.  And if you looked at that, the amount of

12  profit on $31 million in City of Atlanta work, you can only

13  imagine we would be looking at a significantly higher guideline

14  range than what we're looking at in this case.  If you applied a

15  12-percent markup to that case, which is what Kim Ajy testified

16  about, if you provided -- assumed a 12-percent profit margin on

17  $31 million, that's more than $3.7 million in profit.  That could

18  have been a calculation of the loss amount in this particular case

19  rather than the above $40,000 loss.  That would have been an

20  additional 12 levels under the guidelines that would have been

21  applicable here.

22          The other thing, and I think the PSR notes this under

23  the application notes, that when you have this situation where the

24  circumstances may support an upward departure, in fact and

25  circumstances like this, where the amount of harm isn't adequately

1  affected -- reflected by the amount of the bribe itself.

2         Another enhancement that could have been arguably

3  applied and we didn't push for and didn't seek it, was an

4  obstruction enhancement.  We already talked about all of the lies,

5  of course, that Ms. Macrina gave to the FBI and the manipulation

6  that was at issue here.

7         The PSR, you know, ultimately doesn't apply a two-level

8  enhancement.  We didn't seek one.  But you could imagine in a

9  different world if we had, you know, pressed for that, based on

10  the false statements, again, Ms. Macrina would be looking at a

11  guideline range well over 200 months rather than the 63 to 78

12  months that she's looking at here.  In short, those guidelines

13  range provides a significant break to Ms. Macrina compared to what

14  she could have faced based on the evidence that was presented at

15  trial.

16         Overall, the 70-month sentence that the government

17  recommends adequately reflects the seriousness of the offense, the

18  harm to those victims, and the need for general deterrence based

19  on the public corruption that happened under Ms. Macrina's watch.

20  The citizens of Atlanta, the employees of the City of Atlanta

21  deserve better than Ms. Macrina's conduct, and the sentence of 70

22  months is lenient but also sends a proper message that corruption,

23  like what Ms. Macrina did here, will not be tolerated.

24         THE COURT:  Thank you, Mr. Kitchens.

25         Mr. Kish.

1           MR. KISH:  I can stand up here and say that the sun is

2    going to rise in the west again, again, and again, and it does not

3    make it true.  Suffice it to say, the parties have a very

4    different view of what the evidence was here.  The government

5    continually says, as does the presentence report, that Ms. Macrina

6    changed the bidding process.  The evidence is unrefuted.  The

7    procurement department did all of that.  Adam Smith did that in

8    conjunction with the mayor, Kasim Reed.  It's not true.  It's just

9    simply untrue.

10          The government talked about Mr. Ash, who is here.  The

11   Court heard from Mr. Ash when he testified and read his letter.

12   He said no one made us do anything in the evaluation.  The

13   government points to the scoring process.  We pointed out all of

14   the numbers.  You can look at them one way, and Ms. Macrina was

15   harming Jafari's company in the bidding process when she was one

16   of the evaluators.

17          You heard from other people say she never influenced

18   anyone.  The government says that Mr. Barnes, who is here, was

19   lied to, and corroborated somehow the government's version of

20   things.  He did no such thing.  He simply said that he over --

21   with that lunch when Mr. Jafari was talking about the bidding

22   process.

23          Now, remember Barnes, Bocarro, and the other witnesses

24   all said when a contractor gets a contract and then there is a

25   blackout period, that doesn't mean they stop communicating about

1  their current and ongoing contract.  In the middle of a lunch, I

2  got to do better on this bid.  It has been blown so far out of

3  proportion in this case, that it is divorced from reality.

4          The government points out the $31 million that Mr.

5  Jafari's company got.  I hope that anybody on the government team

6  here who is a resident of the City of Atlanta is appropriately

7  grateful for about the first $28 million, which is why we now have

8  30 days of water supply that PRAD was part of the project, as

9  opposed to three days when Ms. Macrina started.  The bulk of

10  PRAD's work and money came from the water supply project.  The

11  witnesses were all consistent.  The government -- and I used the

12  term cherry-picked, and I don't like to do that very often, but

13  accurately in this case cherry-picked these two contracts, Mims

14  Park and the Peyton Center as something that somehow amplifies and

15  shows that Ms. Macrina was in some gigantic scheme to steer $31

16  million worth of contract for a bribe of about 30,000 or $40,000.

17          First, much of the problems with those things happened

18  after she had left the City of Atlanta.

19          Second, it ignores the fact that PRAD did all of the

20  work on the water projects.

21          Third, there is very little evidence about why those

22  projects were awarded the way they were.  There is more evidence

23  that another company was involved first and there were reasons,

24  they were technical engineering reasons why it made sense to

25  switch horses in the middle of a scheme.  But the government's

1   convoluted and esoteric argument about how much harm has been done

2   to the city, ignores that other than this one project which got

3   slow after Ms. Macrina had left the city, had been fired and was

4   cooperating with the investigators, that's the only, quote,

5   unquote, harm we've seen.  Other than the fact -- the government's

6   point is valid -- which is that a jury found that a city employee,

7   basically, stole her job (sic).  That's really what they found,

8   and that's valid.  But all of this other stuff about all of these

9   other contracts is simply a way to blow smoke, to use the

10  government's point.

11        I'm not going to belabor these points, but we look at

12  the evidence very differently, obviously.  We can't in any way

13  argue with the fact that the jury found her guilty.  That's

14  obvious.  But we can still -- and our supporters and our loved

15  ones and friends and family can think that it is a travesty of

16  justice, because it doesn't match up with the person.  I can stand

17  here and say that it sure looks to me like a travesty of justice

18  when someone goes and takes their own money and goes and talks to

19  the FBI months and years at a time and then they turn against her,

20  I think it's a travesty of justice that when they think they've

21  got a problem, they don't tell her to go hire a lawyer to see if

22  we can figure this out.

23        So my point to you, Judge, is that I think there is a

24  lot of different ways to look at the evidence in this case.

25        Finally, the government points to one fact in the *Sharon*

1  *Barnes Sutton* case which they claim might be a reason why Judge

2  Cohen gave a lower sentence under the guidelines as being some

3  sealed materials concerning the defendant's health in that case.

4  And that seems inappropriate to use that as an argument, because

5  that almost makes it looks like we're being punished for

6  Ms. Macrina being a healthy individual.  I don't think that is

7  appropriate.  I think it is more appropriate to simply look at the

8  fact that Judge Cohen from what our perspective is a relatively

9  similar case, imposed a sentence of the sort we're looking for.

10      I do agree with Mr. Kitchens that we're asking for

11  something extraordinary here.  It is extraordinary because the

12  facts here are extraordinary.

13      I think you should seriously consider a noncustodial

14  sentence, Judge, under the circumstances, and that's what we ask

15  you to do.

16      THE COURT:  Thank you, Mr. Kish.

17      MR. KISH:  Thank you.

18      THE COURT:  We start off with offense level of 26, a

19  criminal history category of a 1, and a custody guideline range of

20  63 to 78 months.

21      You know, the government attorneys, in particular, Mr.

22  Kitchens and Ms. Porter has tried cases in front of me before and

23  they've heard me say this before, sentencing is not something that

24  I really cherish, and Mr. Kish kind of touched on it a few minutes

25  ago, but it's part of my job.  Mr. Kish, you've done this for a

1   while.  You and I are about the same age.  We've seen a lot.  But

2   it's part of my job.

3         Ms. Macrina, you are a very accomplished person.  You

4   have accomplished a lot in life.  You know, the water department

5   is a vital, very vital part of any city or county.  Police and

6   fire, every department that the county, Fulton County has or the

7   City of Atlanta is important.  But when you think about the water

8   department, you can't keep going without it.  And to rise up

9   through the ranks the way you did to become the head of the water

10  department for a major city -- Atlanta is a big-time city, guys.

11  That's just all there is to it.  When I complain about the

12  traffic, when I complain about this, but that's what comes with a

13  big-time city.  And to be the water department head, that's big.

14  And, you know, let's be honest about it, to be a female that have

15  come up through those ranks with some obstacles, obviously, in

16  your way as you came up through the ranks and you still

17  accomplished it, I respect you for that.  I agree with Mr.

18  Kitchens, I don't think you're a bad person.  In a sense, you were

19  a role model for a lot of people.

20        The disappointing part for me is that, you know, I sat

21  through the whole trial just like those 12 jurors did.  When

22  people plead guilty in front of me, I'm basically listening to

23  what the government and defense attorney tells me, I'm limited to

24  that.  But when I sit through the whole trial, I hear it all.  And

25  the hardest part for me is that the jury found that you took this

1  great accomplishment and turned it into personal gain.  I know you

2  disagree.  I've read the letters.  And Mr. Kitchens is right,

3  people have the right to disagree and say, well, I think this is a

4  travesty of justice.  But the jury heard the evidence and they

5  found you guilty.  And as I see it, you took that -- all those

6  accomplishments and all the great things you've done -- and not

7  just becoming the department head.  I read where a relative tells

8  that you took them in and helped them out financially.

9          I always said, Mr. Kitchens, you find out who your

10  friends and family members are when they let you have money.

11  Okay?  And you did that.  But you also did something else.  You

12  had a trust there -- not just from the mayor who appointed you to

13  this position, but to the citizens of the community.  And that's

14  to me -- it became discouraging to me.

15          When I said I respect you for what you accomplished, I'm

16  not just saying that.  I don't have to say that.  I said it

17  because I mean it.  I mean it when I say to get to the water

18  commission department head -- and I read the PSR, and I

19  listened -- that's a great accomplishment.  And it hurts my heart

20  that you are sitting here now in the situation you're in.

21          But the evidence showed, and I listened to it and the

22  jury listened to it and the jury returned a verdict.  Again, I

23  know you don't agree, and Mr. Kish and Mr. Bouchard will deal with

24  that further.

25          In looking at all of 3553(a) factors, this is -- the

 1   amount of money that is alleged, between 40 and $95,000 is not a

 2   large sum of money in comparison to other cases I have coming in

 3   front of me.  But consistency in sentencing is one of the things

 4   that 3553(a) factors point out.  It says, and it matters again, it

 5   does affect the way that people look at their government.  If

 6   people don't trust their government, then we have a major problem.

 7   And we have these cases where people are convicted of taking

 8   bribes, that just erodes that consistency.

 9           Your attorneys did an outstanding job for you in this

10   case, and they will continue to do that so.  But I have to render

11   a sentence that I think is fair.

12           Now, Mr. Kitchens, I don't quite agree with your

13   guideline sentence and here is the reason why.  I cannot disregard

14   the good things that she has done.  Again, I'm looking at the

15   conviction, obviously, and what the evidence showed.  But as a

16   judge, I have to look at the whole picture of the person's life,

17   and that takes me away from the guideline sentence.

18           On the other hand, Mr. Kish, this is not the *Sutton*

19   case.  Now, I didn't handle the *Sutton* case, Judge Cohen had the

20   *Sutton* case, one courtroom down the hall.  I'm also in the

21   building.  I know about the cases that come through these pillars.

22   I looked at them, especially when I know I've got cases that come

23   up.  This is not the *Sutton* case.  And I went back and looked at

24   it once I read your sentencing memorandum to make sure I wasn't

25   missing something.  And, you know, I have the right to pull up and

1  look at indictments and look at things, and this is not the *Sutton*

2  case.  So this is not a probation case.

3          And I'll be honest with you, Mr. Macrina and Mr. Kish,

4  when I was looking at this earlier this week, I did consider

5  probation.  I'm not going to lie to you.  You know, I did consider

6  it, but that's my job.  But I have to say it's not.  Mr. Kish, I

7  have great respect for you.  I think you know that.  But I

8  disagree with you.  And I respectfully disagree with you.

9          So taking into consideration the nature and

10  circumstances of this case, the seriousness of this case, and the

11  fact of the consistency in sentencing, I'm now ready to sentence

12  you, Ms. Macrina.  If you will stand up.

13          Let me say this one more time to you.  I'm trying to

14  think of the right words here.  I guess I just want to repeat

15  myself again, and I apologize for repeating.  There is great

16  respect from this Court for what you accomplished, and I don't

17  disregard it.  I understand what it takes to overcome certain

18  obstacles in life to get to certain positions.  But I also realize

19  that the jury says you personally misused that position.

20          With that stated, Count 1, I'm sentencing you to 54

21  months' confinement.  Count 2 will be 54 months' confinement to

22  run concurrent.  Count 3 will be three years' supervised release.

23  Excuse me, Count 1 will be three years' supervised release.  Count

24  2 will be three years' supervised release to run concurrent.

25          Mr. Kitchens, I understand the government asked for a --

1 at the appropriate time I will let you-all to make your

2 exceptions, but again looking at everything here, I think this is

3 not a guideline sentence.  I told you the reason why.  I will hear

4 your exceptions later.

5          $40,000 restitution to be paid back at a rate to be

6 determined by the probation officer.  There will be no fine.  The

7 Court finds this is a reasonable and appropriate sentence after

8 giving it a great deal of thought and consideration.  That's all I

9 have.

10          At this time, are there any exceptions coming from the

11 government?  I'll hear from you now.

12          MR. KITCHENS:  No objections, Your Honor.

13          THE COURT:  Mr. Kish, any exceptions?  I'll hear from

14 you now.

15          MR. KISH:  None other than those already announced,

16 Judge.

17          THE COURT:  And they're so noted for the record again.

18          MR. KISH:  Thank you.

19          THE COURT:  Now, Ms. Macrina, you had a jury trial and

20 the jury returned a verdict of guilty in your case, and you have

21 the right to file an appeal in this case.  Any appeal filed must

22 be done within 14 days of judgment being entered in your case.

23          If you're unable to pay for the cost of an appeal, you

24 may apply for leave to appeal in forma pauperis.  If you so

25 request, the Clerk of Court will prepare and file a notice of

1  appeal on your behalf.

2          I cannot get involved with whatever contracts or bills

3  you have with Mr. Kish or Mr. Bouchard, but if Mr. Kish and

4  Mr. Bouchard at any point in time tells me there is a need for the

5  Court to intervene regarding this matter, I will.

6          Good luck, Ms. Macrina.  Thank you-all.

7          Hold on.  There is a motion of bond.

8          Ms. Kish, Mr. Bouchard, I know you-all strongly,

9  strongly disagree -- you disagree on a number of rulings, I think,

10  in the case.  But I know there are two that you-all strongly

11  disagree with, and you noted them in your motion of bond.

12          I went back, my staff went back, and we went through it

13  again.  I don't think there -- I don't want to sound -- to say

14  this, it's kind of sounding like I'm being a little cocky, or

15  whatever, but I have to say it.  I don't think there is a

16  statute -- a belief on my part that this will be reversed.

17          Now, the Eleventh Circuit will tell you that Judge Jones

18  does not have a perfect record.  All right?  But in looking at

19  it -- and I looked at it.  We went back and looked at it.  We read

20  the government's brief.  We looked -- I can't see it, Mr. Kish.  I

21  can't see it.

22          MR. KISH:  I understand.  It sounds like the Court is

23  denying the motion.

24          THE COURT:  I am denying the motion.

25          MR. KISH:  We haven't addressed the question of whether

1  we can have voluntary surrender.

2          THE COURT:  I'm going to allow her to voluntarily

3  surrender.

4          MR. KISH:  I wanted to make sure of that, because --

5          THE COURT:  Yes, she's going to be allowed to, unless

6  you oppose.

7          MR. KITCHENS:  We do not oppose, Your Honor.

8          THE COURT:  Ms. Macrina is going to be allowed to --

9  there is no reason for her not to voluntarily surrender.  But I'm

10 denying the motion for bond, but I will allow you to voluntarily

11 surrender.

12          What usually happens, Mr. Kish and Mr. Bouchard, it's

13 probably about 45 days after the J&C goes in, they send you a

14 letter to report to such and such place.  I'll say this to you.  I

15 have noticed that -- you want to do this -- continue to follow all

16 of the terms and conditions of your bond.  If anything comes up,

17 the first person you call is one of those two people to your left

18 and your right.  Don't say, "I'm assuming."  Call them if

19 something comes up, especially when you get that letter.

20          Let me just say this.  I have a person right now that is

21 in serious trouble because he made an assumption without calling

22 his lawyer once he got that letter.  He went from -- he's probably

23 going from like an 18-month sentence to something almost double.

24 Call them.  I don't say this to insult you, because you've done

25 everything we've asked so far, and I assume you're going to

1   continue to do that.

2          Anything else from the government?

3          MR. KITCHENS:  Nothing further, Your Honor.

4          THE COURT:  Anything else, Mr. Kish?

5          MR. KISH:  No, sir.

6          THE COURT:  Thank you-all.  Have a good day and a good

7   weekend.

8          (Off the record.)

9          THE COURT:  Mr. Kitchens, Mr. Kish -- let's go back on

10  the record.

11         It was pointed out to me that sometimes the defendant

12  asks about a specific location to serve a sentence.

13         MR. KISH:  Judge, because there are so few facilities --

14  so many fewer facilities for women in the federal system, we think

15  the best thing would be if the Court would put into the J&C, the

16  judgment and commitment, a recommendation that the Bureau of

17  Prisons keep Ms. Macrina as close to her residence in Central

18  Florida as possible.

19         THE COURT:  Done.  I'll do that.

20         MR. KISH:  Thanks, Judge.

21         THE COURT:  Thank you-all.

22         (The hearing concluded at 11:25 a.m.)

23

24

25

1                    C E R T I F I C A T E

2

3   UNITED STATES DISTRICT COURT

4   NORTHERN DISTRICT OF GEORGIA

5

6       I do hereby certify that the foregoing pages are a true and

7   correct transcript of the proceedings taken down by me in the case

8   aforesaid.

9       This the 24th day of February, 2022.

10

11

12

13

14                    /s/Viola S. Zborowski _____
                      VIOLA S. ZBOROWSKI,
15                    RDR, FAPR, CMR, CRR, RPR, CRC
                      OFFICIAL COURT REPORTER TO
16                    THE HONORABLE STEVE C. JONES

17

18

19

20

21

22

23

24

25